COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| | § | No. 08-15-00037-CV |
| | § | Appeal from |
| IN THE INTEREST OF | § | |
| | | 65th District Court |
| D.V., A CHILD. | § | |
| | | of El Paso County, Texas |
| | § | |
| | | (TC # 2013DCM9201) |
| | § | |

**O P I N I O N**

This is an appeal from an order terminating the parent-child relationship between D.V. and his mother. The relationship between the little boy and his father was also terminated, but the father has not appealed. Because of recurrent family violence between the parents, we will refer to Father's behavior where necessary to explain the factual circumstances.[1]

Mother brings seven issues for review. The first five challenge the legal and factual sufficiency of the evidence supporting the statutory grounds for termination. Issue Six challenges the sufficiency of the evidence to support a finding that termination is in the child's best interest. Issue Seven complains of the trial court's refusal to grant a new trial. For the reasons that follow, we affirm.

---

[1] Mother and father were not married, but Father did not dispute paternity.

**FACTUAL SUMMARY**

We begin by noting that Mother has been diagnosed with bipolar disorder accompanied by anxiety and depression. Herself a victim of abuse and neglect leading to foster care, she was 22 years old at the time of trial. She did not finish high school. Case notes from her psychological records indicate she "used to live under a bridge and work as a stripper and then a guy gave me a lift and I landed in El Paso." There is also reference to her engaging in prostitution in return for drugs.

On December 10, 2013 the Department received an intake alleging the neglectful supervision of D.V. According to the affidavit attached to the petition, Mother had used illegal drugs while caring for the infant, who was only nineteen days' old at the time. Department worker Michelle Carillo met with Mother at her home.[2] The child was crying but Mother was initially reluctant to bring him downstairs. When Mother finally acquiesced, Carillo discovered that the infant was on oxygen because he was congested and had been hospitalized. The child also was monitored by a sleep apnea machine. Mother admitted that she had not followed up with the pediatrician. She refused a drug test. The next day, Carillo was assigned the case due to allegations that Mother was using drugs and alcohol while caring for the baby. She attempted to contact Mother, but Mother was no longer in the home and her whereabouts were unknown. On December 12, Carillo learned that Mother was staying at the Opportunity Center and had left D.V. with his father. When Carillo arrived at Father's home, she was told that the baby had been there for two days while Mother looked for a place to live. Carillo noticed that the child was not on oxygen. Father explained that he had been applying the oxygen treatments in the morning and at night but he did not know how to use it or the sleep apnea machine properly. There was also a smell of cigarette smoke in the home and Father admitted there were smokers in the home.

---

[2] Mother was residing in a home with two other individuals who had open CPS cases.

Father submitted to a drug test and tested positive for PCP and THC. He was unable to identify a family member to care for the infant.

Carillo then spoke by telephone with Mother, who indicated that she did not have any family members to care for D.V. Carillo contacted the Child Crisis Center which had no space because they were at capacity. Consequently, the baby was transported to Del Sol Medical Center for evaluation since he had been in a smoke filled environment and had not been on hospital recommended oxygen. It was also unknown if D.V. had special needs due to Mother's drug and alcohol use while pregnant. The infant was evaluated and placed in a foster home. On January 31, 2014, the Department was informed that D.V. was admitted into Providence Memorial Hospital, with a diagnosis of Respiratory Syncytial Virus (RSV) and whooping cough. He was discharged on February 3, 2014, with oxygen and a sleep apnea machine.

Mother has a significant criminal history. In 2011, she was arrested for drunk and disorderly conduct and for carrying brass knuckles. That same year she was arrested for assault on a public servant. In 2012, she was arrested for the sale of cocaine. She was arrested again in 2013 for drunk and disorderly conduct coupled with false identification that she provided to a police officer. She received probation beginning March 6, 2013 which was due to end on March 5, 2017. When she was five month's pregnant, Mother was arrested for possession of a controlled substance and driving while intoxicated, with a blood alcohol level of .15. She was required to enter Aliviane Residential for treatment but was unsuccessfully discharged. At the time the child was removed from the home, Probation Officer Carla Pineda stated that Mother had failed to report and was being evaluated for violation of probation. She was ordered to enter the West Texas Court Residential Treatment Center in February 2014. In March, the facility allowed Mother to leave for a doctor's appointment and she failed to return. When she did

3

return, she tested positive for heroin and was arrested for violation of probation. After a month-long incarceration in jail, she was given a second chance to complete treatment at the facility rather than a prison sentence. She was discharged in July 2014, at which point she was to begin participating in the Department's service plan. Yet during a meeting with her case worker a month later, Mother tested positive for opiates and demonstrated a blood alcohol content of .08. Another relapse followed. According to psychological reports, she appeared before a judge on December 14, 2014 in connection with her probation. She was ordered to give a urine sample which came back "dirty." She was jailed and released on December 16. Her progress notes indicate that she had not told the CPS caseworker because it would affect her case.

Margarita Guerra was the caseworker assigned to D.V. by Child Protective Services. She explained the circumstances of the child's removal. Significantly, this was not the first child removed from Mother's care. In 2012, she relinquished her rights to the baby's older half-brother. D.V. was placed in foster care with his brother as the Department began services. It requested that Mother complete an OSAR substance abuse evaluation and follow all recommendations, submit to random alcohol and drug screenings as deemed appropriate by the Department, allow the caseworker access to her home at least once monthly, participate in and complete individual therapy with a focus on anger management, undergo a psychological evaluation, participate in and complete parenting classes, and participate in and complete domestic violence classes. Guerra testified to Mother's fulfillment of her service plan, or lack thereof:

> Q. And in regard to those services that we were talking about, has [Mother] completed any of the services within her service plan?
> A. The only service that she completed was the anger management.
> Q. So was she ordered to do parenting, for example?
> A. Yes.
> Q. Did she complete that?

4

A. No.
Q. Did she complete the domestic violence counseling?
A. No.
Q. Did the department order her to do a psychological evaluation?
A. Yes.
Q. Have we been able to verify whether or not she completed that?
A. No.

Mother did sign a release and provided the doctor's name and her rehabilitation specialist with Emergence Health Network, the entity providing mental health services. In December, Mother contacted Guerra, asking for a referral for the psychological evaluation with Dr. Schutte. She was referred on December 15, 2014 and the appointment was scheduled the Monday before trial. Guerra had not been able to verify whether she attended.

Questioning of Guerra then turned to domestic violence, which was a significant issue to the Department. Mother reported that she had been in a series of abusive relationships. After her discharge from the treatment center, Mother resumed her relationship with Father and there had been several incidents of domestic violence between them. Guerra testified that at one point, Mother told her that she had been hospitalized because she had fallen down the stairs. But the medical records indicated that the fall was not accidental and charges remain pending against Father.

The psychological assessments from Emergence are also enlightening. On October 17, 2014, case notes reflect Mother had bruises on her left arm and a bruise on her left eye. She explained, "My boyfriend and I were horseplaying and he accidentally elbowed me." Entries from October 24 reflect other statements she made to her mental health care provider:

- [S]he has been depressed because she has been having a hard time understanding her boyfriend and why he hits her and makes her feel bad. [She] states, I try to change and I have but he continues to treat me like shit and I am tired of it; I sometimes think that he going to change but the hitting has only gotten worse.

5

- [M]y boyfriend is always telling me that I better not flirt with the people in my class and tells me that if he passes by my classroom door and sees me talking or looking at a guy he will hurt me. I am trying to help him be better and he just does not give a fuck about me.

Case notes from November 4 reflect, "I also talked to my boyfriend and told him that I was going to leave him if he ever touched me and hit me." She then related that Father had been treating her better, took her to a restaurant of her choice, and proposed to her. The proposal meant a lot to her and made her happy that he wanted something more serious with her. As recently as a month before trial, Mother and Father were still together. At the service plan meeting, she was wearing the engagement ring. Guerra testified:

Q. How do you know that it was from him?
A. She told me.
Q. She told you that she had an engagement ring from Father?
A. Yes.
Q. And when's the last time you saw her wearing that ring?
A. The day of the service plan meeting, December 15th.
Q. Less than a month ago?
A. Yes.

The Department had other issues with Mother, who only attended six visits throughout the pendency of the case. Even then, she terminated the visits early because she became frustrated and could not handle D.V. when he cried. She never brought toys or clothing. The missed appointments caused the Department to suspend her visitation four different times.[3] Upon her release from treatment in July 2014, she enrolled in technical school and frequently used school as a reason for missing visitation. Guerra asked for a school schedule to facilitate visitation, but Mother did not provide it for several months. Mother has not seen her son since July 30, 2014 and never contacted Guerra about bringing the baby a birthday present or a Christmas present.

---

[3] The Department will suspend visitation if a parent misses three consecutive visits.

Guerra also expressed concerns about Mother's ability to parent. She had not bonded with D.V. nor completed any services to ensure his safety. There were also problems maintaining contact with Mother, despite a requirement that she contact the caseworker at least once monthly. The Department could not verify that she had a stable living environment, that she had maintained sobriety, or that she was working her service plan toward reunification. In short, Guerra opined that returning the baby to Mother was not in his best interest.

Guerra also testified that a criminal history and drug possession are endangering factors to a child.

> If she is selling drugs or even using them, then that's going to impede her ability to take care of [D.V]. Basically she's involving herself in criminal activity that can land her in jail. And, also, obviously the people that she's hanging around with is not going to be the best influence on [D.V.]

Domestic violence is another element of endangerment, according to Guerra. The level of violence between the parents had escalated to actual injury, posing a threat to D.V. if he happened to be nearby. She gave the example of Mother having been "thrown down the stairs" and the possibility that she could have been holding the baby in her arms. Family violence presents a danger to the child's emotional well-being as well, because, "seeing that his parents are fighting and the verbal - even just the verbal altercations can influence his development and his attachment to them."

Turning to the baby's foster placement and progress, Guerra testified that he has "flourished". At trial, he was one year old, living in a foster home with his half-brother, and doing very well:

> Well, [D.V.], when he came into care, he had a lot of needs and subsequently he ended up very sick with whooping cough and RSV. He flourished. I mean he did literally a 360 in the home. After he's received his treatment, every month I would go see him. His symptoms had started to subside. Eventually, I mean, he's a normal child. He hasn't had any albuterol treatments for four or five months

7

now.  He's now walking.  He's -- I would say he's developmentally on target at this point.  He's bonded very well with all of the family members including his brother and he's doing really well.

The foster parents have adopted the brother and Guerra related that it is their intent to adopt D.V. as well, in order to keep the brothers together.

The only other witness to testify was M.M., D.V.'s foster mother and the adoptive mother of D.V.'s older brother.  She explained that D.V. was very ill when he first came to them but he is now a very healthy, developing, normal little boy.  He has been discharged by his gastroenterologist and has no more reflux disease.  She had not heard from Mother on the boy's birthday or at Christmas.  She and her husband "would love to adopt" the child.

The CASA representative then offered his recommendation concerning this little boy:

Based on the actions and inactions of the parents throughout the life of this case, as well as the significant criminal and drug issues that have been historically throughout the case and the case before, it's CASA's recommendation that [D.V.]'s best interest would best be served by terminating the parental rights of [Mother] and [Father] freeing him up for adoption.  He's in a beautiful home.  He has flourished.  He is part of their family.  He is loved.  He is safe.  And again he's with his brother so he will never be alone; he will always have family.  I think that would be the best way to serve his best interest.

## PARENTAL TERMINATION

A parent's rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code.  *See* TEX.FAM.CODE ANN. § 161.001 (West 2008).  Under this provision, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the child.  *See id.*  Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Texas Department of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987).

The natural right of a parent to the care, custody, and control of their children is one of constitutional magnitude. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985); *see also Santosky v. Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (acknowledging that a parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests, "far more precious than any property right"). Not only is a parent's interest in maintaining custody of and raising her children "paramount;" it is quite possibly the oldest fundamental liberty recognized by our courts. *See In the Interest of M.S., E.S., D.S., S.S., and N.S.,* 115 S.W.3d 534, 547 (Tex. 2003) (noting that Texas courts recognize that "a parent's interest in maintaining custody of and raising his or her child is paramount"); *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) (in discussing the constitutional stature of parental rights, the United State Supreme Court said, "the interest of parents in the care, custody, and control of their children--is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *see also In re M.S.,* 115 S.W.3d at 549 ("Termination of parental rights is traumatic, permanent, and irrevocable."). Although parental rights are of constitutional magnitude, they are not absolute. *In the Interest of C.H.,* 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

### Burden of Proof

Because of the importance of parental rights, and the severity and permanency of termination, the quantum of proof required in a termination proceeding is elevated from a preponderance of the evidence to clear and convincing evidence. *Santosky,* 455 U.S. at 747, 102 S.Ct. at 1391; *accord Holick,* 685 S.W.2d at 20-21; s*ee In re M.S.,* 115 S.W.3d at 547 and *In the*

9

*Interest of D.S.P. and H.R.P.,* 210 S.W.3d 776, 778 (Tex.App.--Corpus Christi 2006, no pet.) (cases recognizing that involuntary termination of parental rights is a drastic remedy which divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent.); *see also In the Interest of B.L.D. and B.R.D.,* 113 S.W.3d 340, 353-54 (Tex. 2003) (noting that because of the severity and permanency of termination, due process requires the party seeking to terminate parental rights prove the necessary elements by the heightened burden of proof of clear and convincing evidence).

"Clear and convincing evidence" means the measure or degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX.FAM.CODE ANN. § 101.007 (West 2008); *see In the Interest of J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002); *see also In the Interest of J.A.J.,* 243 S.W.3d 611, 616 (Tex. 2007) (contrasting the standards applied in termination proceedings and the standards applied in modification proceedings); *In the Interest of C.D. and K.D.,* No. 02-10-00070-CV, 2011 WL 1743688, at *4 (Tex.App.--Fort Worth May 5, 2011, no pet.). This intermediate standard falls between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979); *In the Interest of D.T.,* 34 S.W.3d 625, 630 (Tex.App.--Fort Worth 2000, pet. denied) (op. on reh'g). Although the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington,* 588 S.W.2d at 570.

## Standards of Review

The Supreme Court has clearly articulated the applicable standards of legal sufficiency review in termination cases. Accordingly, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.,* 180 S.W.3d 570, 573 (Tex.2005), *quoting In re J.F.C.,* 96 S.W.3d at 266. We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id.; In re J.F.C.,* 96 S.W.3d at 266. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.,* 180 S.W.3d at 573; *In re J.F.C.,* 96 S.W.3d at 266. A legal sufficiency or no evidence point will only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Swinney v. Mosher,* 830 S.W.2d 187, 194 (Tex.App.--Fort Worth 1992, writ denied).

## Statutory Predicates

The termination order here was based on Tex.Fam.Code Ann. § 161.001(1) (D)(E)(N)(O) and (P), with the court finding that Mother had:

- Knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

- Engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

11

• Constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the child to the mother; (2) the mother has not regularly visited or maintained significant contact with the child; and (3) the mother has demonstrated an inability to provide the child with a safe environment;

• Failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child; and

• Used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance.

Both subsections (D) and (E) require proof of endangerment, which means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *Doyle v. Texas Department of Protective and Regulatory Services,* 16 S.W.3d 390, 394 (Tex.App.--El Paso 2000, pet. denied). While endangerment means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *Doyle,* 16 S.W.3d at 394. Subsections (D) and (E) differ in one respect: the source of the physical or emotional endangerment to the child. *See In Interest of B.S.T.,* 977 S.W.2d 481, 484 (Tex.App.--Houston [14th Dist.] 1998, no pet.); *In Interest of S.H.A.,* 728 S.W.2d 73, 83-84 (Tex.App.--Dallas 1987, writ ref'd n.r.e.). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle,* 16 S.W.3d at 394. Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under Subsection D. *Id.; see In re W.S.,* 899 S.W.2d 772, 776 (Tex.App.--Fort Worth 1995, no writ) ("environment" refers to the acceptability of living

conditions, as well as a parent's conduct in the home). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.,* 280 S.W.3d 494, 502 (Tex.App.--Fort Worth 2009, no pet.). The fact finder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *Id.* Thus, subsection (D) addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E). *Doyle,* 16 S.W.3d at 394; *B.S.T.,* 977 S.W.2d at 484; *S.H.A.,* 728 S.W.2d at 84.

Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act. *Doyle,* 16 S.W.3d at 395; *B.S.T.,* 977 S.W.2d at 484; *S.H.A.,* 728 S.W.2d at 83-84. The conduct to be examined includes what the parents did both before and after the child was born. *In Interest of D.M.,* 58 S.W.3d 801, 812 (Tex.App.--Fort Worth 2001, no pet.); *Dupree,* 907 S.W.2d at 84. To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct. *Dupree,* 907 S.W.2d at 84; *In Interest of C.D.,* 664 S.W.2d 851, 853 (Tex.App.--Fort Worth 1984, no writ). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In Interest of K.M.M.,* 993 S.W.2d 225, 228 (Tex.App.--Eastland 1999, no pet.). The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct. *In Interest of N.K.,* 99 S.W.3d 295, 300 (Tex.App.--Texarkana 2003, no pet.). Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and

13

ability to parent may establish an endangering course of conduct. *In re J.T.G.,* 121 S.W.3d at 133. Imprisonment alone does not constitute an endangering course of conduct but it is a fact properly considered on the endangerment issue. *Boyd,* 727 S.W.2d at 533-34; *In re R.W.,* 129 S.W.3d at 743-44. Routinely subjecting a child to the probability that he will be left alone because his parent is in jail, endangers the child's physical and emotional well-being. *See In the Interest of S.D.,* 980 S.W.2d 758, 763 (Tex.App.--San Antonio 1998, pet. denied). However, "the relationship of the parent and child, as well as efforts to improve or enhance parenting skills, are relevant in determining whether a parent's conduct results in 'endangerment' under section 161.001(1)(E), even where the parent is incarcerated." *In the Interest of D.T.,* 34 S.W.3d 625, 640 (Tex.App.--Fort Worth 2000, pet. denied).

Termination under subsections (N) (O) and (P) are inherently fact-driven. The Department has the burden to establish the statutory elements of constructive abandonment, failure to comply with a service plan, or failure to address substance abuse issues that endanger the health or safety of the child. We bear in mind that "[o]nly one predicate finding under Section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Consequently, we will address Mother's point of error related to subsection E. We will not repeat here the full details described above, but highlight Mother's parental deficiencies.

The evidence establishes a pattern that has burdened Mother most of her life. She suffers from bipolar disorder. She is a drug user, at best, or drug abuser, at worst. She has been arrested on drug charges, but most significant to this analysis is her drug usage both during pregnancy and after this little boy was born. Indeed, this led to revocation of probation on pending drug charges. In fact, on the day the Department checked on D.V., Mother refused a drug test. D.V.,

14

who was 19 days' old, had just been released from the hospital, and was supposed to be receiving oxygen and using a sleep apnea machine. Mother admitted that she had not followed up with the pediatrician.

Mother's visitation with her son was suspended four times because she was grossly inconsistent in keeping her appointments. Even when she arrived, she frequently left early because she had little ability to relate to or comfort the baby. She has already had her parental rights to another child terminated, but she continues to repeat her mistakes.

The issue of family violence was of considerable importance to the Department. Mother reported that she had been in a series of abusive relationships. After her discharge from the treatment center, she resumed her relationship with Father and there had been several incidents of domestic violence between them. The caseworker testified that at one point, Mother told her that she had been hospitalized because she had fallen down the stairs. But the medical records indicated that the fall was not accidental and charges remain pending against Father. Despite recurring discussions of abuse with her mental health provider, Mother was sporting an engagement ring just before trial commenced and happily admitted that she and Father were now engaged. These themes weave throughout the record. In addition to her drug problems and her inability to extract herself from a violent relationship, she has repeatedly demonstrated poor judgment, poor parenting skills, and an inability to give priority to her son. Because the evidence is both legally and factually sufficient to support the finding, we overrule Issue Two and do not consider Issues One, Three, Four, and Five.

### *Best Interest of the Children*

A determination of best interest necessitates a focus on the child, not the parent. *See In the Interest of R.F.,* 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). However, there is a

15

strong presumption that it is in the child's best interest to preserve the parent-child relationship. *Swate v. Swate,* 72 S.W.3d 763, 767 (Tex.App.--Waco 2002, pet denied). The Texas Supreme Court has enumerated certain factors which should be considered: the child's desires; the child's emotional and physical needs now and in the future; the emotional and physical danger to the child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex. 1976) ("the *Holley* factors"). Also, permanence is of paramount importance in considering a child's present and future needs. *Dupree v. Texas Department of Protective & Regulatory Services,* 907 S.W.2d 81, 87 (Tex.App.--Dallas 1995, no pet.).

We will address the *Holley* factors as they are relevant to D.V. At his tender age, he of course has expressed no desires with regard to a relationship with his mother. The emotional and physical danger to him, both now and in the future, is of great proportion because of Mother's substance abuse, neglect of D.V.'s health and safety, and continued abusive relationship with Father. Mother's parenting abilities are woefully inadequate. She has relinquished the rights to one son and did not bother to appear at this trial. She visited only six times during the pendency of the case and terminated several of those early because she was frustrated and overwhelmed with her inability to handle the infant. Her visitation was suspended four times because of her failure to participate. She has also failed to avail herself of the programs available to improve her parenting skills. Her only plan for the child is evidenced by a note in the CASA worker's

16

report that she wants to complete schooling to become a cosmetologist so she can provide for her child. She had the opportunity to appear and testify concerning her other plans, but she did not do so. The foster home offers D.V. love and stability, together with the companionship of his half-brother. The foster parents have adopted the brother and want to adopt D.V. as well. Mother's acts and omissions have been detailed in full in the factual summary and we do not repeat them here other than to say that her priorities have been drugs, alcohol, and an unstable and abusive environment. We understand that Mother is young and carries scars from her own childhood. While she recognizes her limitations to some degree, she lacks the willingness or the ability to take advantage of assistance to improve her life and the life of her son. For all of these reasons, clear and convincing evidence supports the trial court's finding that termination is in the child's best interest. We overrule Issue Six.

### *Motion for New Trial*

In Issue Seven, Mother complains of the trial court's denial of her motion for new trial. She maintains that she sought a new trial based on the fact she failed to appear at the final hearing which she claims was not the result of conscious disregard, but rather, mistake. She believed the trial had been postponed and contends that her rights would not have been terminated if she had presented evidence at the hearing. She further suggests that because of her mental health issues, a guardian ad litem should have been appointed. Lastly, she sought an evidentiary hearing because evidence was not presented at trial concerning her efforts at completing services.

It is clear from the record that Mother's trial counsel appeared and sought a continuance because he had not been able to contact his client. It is also clear that Mother was present at the hearing on December 11 when the January 7 trial date was set. As the Department noted at the

hearing, if counsel has notice of the final hearing, notice is imputed to the client. *See In re F.E.M.,* 2013 WL 1092716 *6 (Tex.App.--Eastland Mar. 14, 2013, pet. denied). But here, Mother had actual notice as well.

With regard to a guardian ad litem, trial counsel did not request one. In any event, our review of the record assures us that he presented an admirable case on Mother's behalf, including effective cross-examination of the Department's witnesses. Absent a request by counsel and evidence suggesting such an appointment was necessary, we find no abuse of discretion in the trial court's failure to *sua sponte* appoint a guardian.

As for evidence concerning Mother's efforts to complete services and treatment, appellate counsel advised the court:

> In addition, Your Honor, my client will testify that on or about the time of the final hearing was the period of time where she had gone back to treatment, Your Honor. And I think it was probably the day before or the day after so [Mother] was still in the process of doing her services and staying in rehab at the time that that final hearing occurred, Your Honor.

At that point, the trial court reviewed the transcript of the trial and offered the following observations:

> All right. When Mr. Cox announced on behalf of the mother, he stated: "Chris Cox on behalf of respondent parent -- mother, Judge, -- respondent mother [name deleted] who is not present, Judge. I'm going to be forced to ask for a continuance because I've not been able to talk to her since the last time we appeared on the 11th of December. And at this point in time, I'd like to announce not ready."
>
> So he didn't -- **so obviously if his client had kept in contact with him, he would have been able to tell the court that she had just started treatment.** I do show that Mr. Cox did cross-examine Ms. Guerra at length. There was quite a bit of cross-examination. (Emphasis added).

Finding no abuse of discretion, we overrule Issue Seven affirm the judgment of the trial court.

June 3, 2015

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.