

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00403-CV

IN THE INTEREST OF L.A., A
CHILD

----------

FROM COUNTY COURT AT LAW NO. 1 OF PARKER COUNTY
TRIAL COURT NO. CIV16-0753

----------

## MEMORANDUM OPINION[1]

----------

In four issues, Appellant Mother appeals the termination of her parental

rights to L.A.,[2] the child that is the subject of this suit.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

[2]In accordance with rule 9.8, we refer to children and family members by aliases or initials. Tex. R. App. P. 9.8(b) & cmt.

## Background

At the time of trial in October 2016, Mother was 28 years old and had six children, of which L.A. was the youngest.[3] L.A. was almost two years old at the time of trial.

## I. Mother's drug use

Mother's history of drug use began at the age of 21. At trial, she admitted to having used heroin, cocaine, and morphine. She failed more than one blood test during the proceedings below, including testing positive for cocaine and morphine just two months prior to trial.

Mother claimed that she had quit using drugs in 2011 due to heart problems. However, she also admitted to using drugs at the outset of her pregnancy with L.A., although she claimed she stopped using drugs again once she learned she was pregnant.

Nevertheless, L.A. tested positive for morphine and cocaine at birth. And while Mother initially claimed that L.A. tested positive for morphine due to morphine administered to Mother by the hospital during L.A.'s birth, a review of medical records indicated otherwise. Mother was administered morphine in the hospital, but not until after L.A. was born. Mother offered no explanation as to why L.A. would have tested positive for cocaine at birth, although Texas Department of Family and Protective Services (Department) caseworker Melanie

---

[3]The identity of L.A.'s father was unknown at the time of trial.

Scott testified that Mother showed no surprise when she was informed of this fact.

At trial, Mother admitted that it was her fault that L.A. was born with drugs in her system, but she insisted that she "never used the drugs after the fact of knowing [she] was pregnant." Mother tested negative for drugs when L.A. was born.

## II. The Department's involvement

As a result of L.A.'s positive drug test at birth, the Department opened an investigation and subsequently directed Mother to Family Based Safety Services (FBSS). According to Scott, the purpose of FBSS is to provide a less stringent alternative to legal action or removal of the child by providing families with service plans using resources within the family's community. The Department implemented a Parental Child Safety Placement (PCSP) that required that Mother's children, including L.A., live with Mother's parents, J.A. and T.A., in their home. While Mother was permitted to stay at her parents' house during the day and interact with the children under the supervision of the grandparents, she was prohibited from staying overnight. In compliance with the PCSP, the family arranged for Mother to sleep in a travel trailer parked next to the house.

### A. Mother's failure to comply with her service plan

The PCSP also required Mother to complete a drug and alcohol assessment, participate in counseling, take parenting classes, and submit to random drug testing. Mother did not comply, however. During a seven-and-a-

half month period, Mother submitted to only one drug test, which she passed, but she refused to take others when requested.[4] Mother admitted that she failed to attend the scheduled alcohol and drug assessment, but claimed such failure was due to being sick on that day. When asked why she never rescheduled the assessment, she testified that she "never got around to doing it." As for counseling, Mother stopped attending counseling after completing "three or four" sessions. She never attended any of the required parenting classes.

Among other excuses, Mother blamed her failure to comply with the service plan, as well as her failure to obtain employment and housing, on the fact that she did not have a valid driver's license or transportation. Her driver's license was suspended and her car had been stolen more than two years prior to trial. According to Mother, her Social Security card and her birth certificate were in the car when it was stolen, and Mother claimed that during those two years, she did not have an opportunity to either reinstate her driver's license or to obtain another form of identification. According to Mother, she could not obtain an identification card without the documents, and without a valid form of identification, Mother could not sign up for government benefits, including

[4]At trial, Scott expressed concerns about Mother's former partner, Manuel, who is the father of three of her children and was living with Mother in February 2015. Manuel had previously been incarcerated, and he refused to take a drug test when asked to do so by the Department in February 2015. Mother's lack of concern about her former partner's presence around L.A. concerned Scott and led her to question Mother's judgment and decision-making abilities. At the time of trial, Manuel and Mother were no longer in a relationship, but Manuel still had access to their three children.

housing, or obtain a job. Although she admitted that, with her mother's help, she could have obtained a new copy of her birth certificate, which would have enabled her to obtain a new ID card, she claimed that during that two-year period, her mother was never available to go with her to obtain a replacement. She did manage, however, to go to a nail salon and on a vacation with her mother during the same time period.

When she was asked at trial how she could care for her child without transportation or a driver's license, Mother testified that she planned to "continue to try to get everything [she] need[s] to get a job and take care of them financially on [her own]." But when Mother was asked what steps she had taken to achieve this goal during the past year, she answered, "nothing."

## B. Mother's failure to communicate and cooperate with FBSS

Scott described the difficulties she experienced in reaching Mother and communicating with her. According to Scott, although she made numerous attempts to reach Mother by phone call, text message, or email, she was rarely successful in reaching her. At times, Mother's phone did not work and, at other times, she had no phone at all. At trial, Mother described her contact with caseworkers as "off and on."

On April 14, 2015, Mother violated the PCSP by taking her three youngest children, including then four-month-old L.A., from the grandparents' home in Parker County and driving to Fort Worth unsupervised. After Scott reached Mother by phone and informed her that she had violated the plan, Mother argued

5

that the PCSP was no longer in effect. At trial Scott admitted that the original PCSP did include an expiration date of April 1, 2015, but testified that prior to April 1, the plan had been "reinstated" such that it would be continued until Mother received a drug and alcohol assessment. Scott testified that she and Mother had discussed this continuation, that Mother understood it, and that Mother had a written copy of that service plan. When Scott reminded Mother of this, she said Mother apologized, said that she must have "looked at it wrong," and explained that she was "out looking for a job" with her children.

During that conversation, Scott directed Mother to bring the children to the Department that day. Mother responded that she would try to, but that she did not have much gas money. Mother did not bring the children to the Department that day. In fact, Mother and L.A. were not located again until months later.

When confronted at trial about why she had taken the children in violation of the safety plan, Mother admitted that it was not because she thought her agreement to be supervised had expired, but instead because she was unhappy that she could not get a new caseworker and that she did not intend to work with the Department until they replaced Scott. She admitted that when her father tried to stop her from taking the children from their home, she told him, "until they can give me a new caseworker that will actually communicate with me, unlike Ms. Scott . . . , then I was going to take the kids with me."

During this period of absconsion, Mother's older children and her parents claimed that they did not know where she was and that despite their having tried

6

texting and phoning her, she would not answer or respond. According to Scott, even the older children were concerned because Mother had L.A. with her at the time. After a month passed without any contact with Mother, Scott employed a special investigator to locate her and L.A. Scott testified at trial that she was worried for L.A.'s safety and concerned that L.A. could have been exposed to drugs again.

Also during that time, Scott received word that Mother had dropped off one of the three children—not L.A.—at his paternal grandmother's house. Scott became increasingly alarmed when she viewed a photograph of that child showing insect bites all over his body, bites that had become so infected that the grandmother sought emergency room treatment for him. The child's hair was also matted, and his head was infested with lice.

Scott testified that in the months that followed, the grandparents were uncooperative in trying to locate L.A., insisting that they did not know where Mother was, even though Mother had been in contact with them and had even returned another child—again, not L.A.—to them at some point. When that happened, the grandparents did not call Scott to let her know. Scott testified that from the time Mother left with the three children, Scott continued to experience various problems with the grandparents, including communication problems.

## C. Petition to terminate and removal of the children

By September 2015, when Scott still could not locate Mother or L.A., the Department filed a petition to terminate Mother's parental rights to all six children.

At a hearing in October 2015, the Department requested that the children be taken into emergency custody. Mother was not present for the hearing. She arrived late at the court with L.A., after the hearing had already ended. At the conclusion of the hearing, the Department was appointed temporary managing conservator of all six children, and all children, including L.A., were taken into custody later that day.

At final trial, Teresa Sweatman, the Court Appointed Special Advocate (CASA) for L.A., testified that when L.A. was taken into custody, she too had nits and lice moving around in her hair and she "smelled funny . . . [j]ust dirty." Sweatman also testified that she was surprised when L.A., who was eight or nine months old at the time she was taken into custody, came to her without hesitation. According to Sweatman, L.A. was "very comfortable with anybody," without any apparent fear of strangers.

Sweatman testified that during the year that she acted as CASA for the children, she attended visitations held between Mother and the children and also visited separately with the children once a month. Thus, she was able to observe and visit with the children as often as three or four times a month. Mother admitted that she was not consistent in attending the scheduled visitation sessions, blaming transportation problems for her absences. When the Mother missed visitations, the children were still allowed that time to visit with each other.

On Easter weekend of 2016, after Mother had missed nine visits but finally showed up for one, Sweatman sat her down for what she described as a serious,

8

hour-long, face-to-face conversation. During their discussion, Sweatman shared with Mother the disappointment that the children experienced when their Mother did not show up for visits. Sweatman also expressed concerns about Mother's failure to communicate with her attorney and caseworkers, about her drug use, and about "her program."

After their talk, Sweatman was encouraged about Mother's prospects. Sweatman testified that she thought, "she's going to get this. She's got this." And Mother did improve somewhat. She started attending visitations with more consistency, although her attendance was still not perfect. Sweatman observed that Mother appeared to lack concern about L.A.'s ongoing development or needs. Mother never asked about L.A.'s medical care, her physical growth or development, her day-to-day care, her current interests, or changes. According to Sweatman, Mother never provided anything tangible for L.A., such as clothes, diapers, formula, toys, or gifts.[5]

Sweatman also noted that L.A.'s grandmother, who transported Mother to visitations, showed similar indifference—she, too, never inquired about L.A.'s development, medical care, or her foster placement and, except for one pair of overalls, she, too, never provided anything tangible for L.A. Nevertheless, Sweatman noted that she observed a bond between the grandmother and L.A. And, according to Sweatman, L.A. was also well-bonded with her siblings.

---

[5]Mother testified that she had provided clothes for L.A. to the foster parents.

9

Because of these bonds, Sweatman testified, being separated from her siblings would not be in L.A.'s best interest.

### D. Placement of the other five children with family members

In the year between the October 2015 hearing and the trial held in October 2016, all of the children, except L.A., were placed with family members. The paternal grandparents of three of the older children took their three grandchildren, plus a fourth child who is not biologically related to them. Mother requested that L.A. be placed with them as well, but the Department did not support that plan. Sweatman testified that a fifth child would be too much for them to handle and that they did not have space for a fifth child.

The Department also opposed placing L.A. with Mother's parents because they had been uncooperative during the proceedings, they did not appear interested in caring for the children, and when the children had been with them in the past, the children essentially had to take care of themselves. Additionally, Scott testified that while the children were living with them, the home lacked stability, the children often had head lice, they were not properly clothed, they were dirty, and the oldest child "acted like the mother."

### E. L.A.'s placement with a foster family

L.A. was taken into custody in October 2015 and placed with a foster family the same day, and according to Sweatman, at the time of trial L.A. was thriving there. She described L.A. as active, climbing, running, screaming, and as "a beautiful, happy, healthy little girl." L.A. had a foster sibling, a brother who

was seven at the time of trial, and who Sweatman described as very loving, doting, and protective toward L.A.

## III. Termination of Mother's parental rights

In addition to the trial court's finding that it was in L.A.'s best interest to terminate Mother's parental rights, the trial court made three additional findings. The trial court found that Mother had knowingly placed L.A. in conditions or surroundings which endangered her physical or emotional well-being, *see* Tex. Fam. Code Ann. § 161.001(b)(1)(D) (West Supp. 2016), engaged in conduct or knowingly placed L.A. with persons who engaged in conduct which endangered the physical or emotional well-being of L.A., *see id.* § 161.001(b)(1)(E), and failed to comply with the terms of the FBSS imposed by the Department, *see id.* § 161.001(b)(1)(O). The trial court appointed the Department as the permanent managing conservator of L.A.

## Discussion

Mother brings four issues on appeal. In her first issue, Mother argues that the trial court erred in ordering the removal of the children at the temporary orders hearing. In her second and third issues, Mother argues that there was insufficient evidence to support termination on the grounds of Section 161.001(D) and (E) of the family code. In her fourth issue, Mother challenges the sufficiency of the evidence to support the trial court's finding that termination was in the best interest of the child.

11

## I. Temporary orders removing children from Mother's custody

Mother's first issue complains of the initial removal of the children from her possession following the hearing held pursuant to section 262.205. In particular, she complains that certain affidavits admitted into evidence contained hearsay and were admitted without proper predicate.

Section 262.205 of the family code provides that, in a suit requesting possession of a child filed by a governmental entity in which the governmental entity does not have possession of the subject child or children, the court may render temporary restraining orders as provided by section 105.001. Tex. Fam. Code Ann. § 262.205(a) (West 2014). Temporary orders issued in a suit affecting the parent-child relationship are not appealable. *Id.* § 105.001(e) (West 2014); *In re J.W.L.*, 291 S.W.3d 79, 83 (Tex. App.—Fort Worth 2009, orig. proceeding). Mother's complaint is an attempt to appeal the temporary orders issued by the trial court on October 15, 2015, a complaint which we do not have jurisdiction to consider. We therefore overrule Mother's first issue.

## II. Sufficiency of evidence supporting termination

### A. Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever

permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 563; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), 161.206(a); *E.N.C.*, 384 S.W.3d at 802. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely

on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

Mother challenges the sufficiency of the evidence supporting the trial court's findings of best interest and its findings under section 161.001(b)(1). We will first address Mother's challenge to the best interest finding.

## B.  Best interest finding

Mother's fourth issue argues that the evidence was legally and factually insufficient to support a finding that termination of Mother's parental rights was in the best interest of L.A.  *See* Tex. Fam. Code § 161.001(b)(2).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved the challenged finding that termination was in the best interest of the child.  *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in the light most favorable to the finding and judgment.  *Id.*  We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so.  *Id.*  We disregard all evidence that a reasonable factfinder could have disbelieved.  *Id.*  We consider undisputed evidence even if it is contrary to the finding.  *Id.*  That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.  *See id.*  We cannot weigh witness credibility issues that depend on the

14

appearance and demeanor of the witnesses because that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d

15

at 28. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include

> (A)     the desires of the child;
>
> (B)     the emotional and physical needs of the child now and in the future;
>
> (C)     the emotional and physical danger to the child now and in the future;
>
> (D)     the parental abilities of the individuals seeking custody;
>
> (E)     the programs available to assist these individuals to promote the best interest of the child;
>
> (F)     the plans for the child by these individuals or by the agency seeking custody;
>
> (G)     the stability of the home or proposed placement;
>
> (H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and
>
> (I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the

presence of scant evidence relevant to each factor will not support such a finding. *Id.*

As an infant, L.A. is unable to express her desires, but it is clear that Mother's continued drug use placed L.A.'s emotional and physical needs in danger. Mother's positive drug test—for both cocaine and morphine—as late as the eve of trial provides evidence that drugs, rather than the potential loss of her parental rights to her child, were her primary concern.

Although Mother professed that she would prove to the trial court that she could care for L.A., when given a two-year opportunity prior to trial to demonstrate this, she failed. At trial, she admitted this—that she had done nothing to show the trial court that she was prepared to care for L.A. and provide for her daily needs and instead offered excuses for her failure. Although she was offered a number of resources to assist her in improving her parenting skills, she did not take advantage of them, and when the children were in her care, she did not demonstrate adequate parenting skills.

Finally, although separation of a child from his or her siblings is not generally in the best interest of a child, the evidence showed that placing L.A. with her grandparents was not in her best interest and that placing her with the paternal grandparents of three of her siblings was simply not an option. Furthermore, testimony at trial showed that L.A. was thriving in her foster care placement, a placement that provided L.A. love and stability.

The evidence presented was sufficient to support a finding that termination was in L.A.'s best interest. *See, e.g.*, *In re D.V.*, 480 S.W.3d 591, 603–04 (Tex. App.—El Paso 2015, no pet.) (holding best interest of child was shown through evidence of mother's substance abuse, her neglect of child's health and safety, evidence her parenting abilities were "woefully inadequate," and her failure to avail herself of resources to improve her parenting skills); *In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet.) (holding best interest was shown where mother was a drug addict that had never successfully completed treatment, admitted that she could not take care of child, had no stable income, did not have a stable residence, and child was doing well since placement with foster parent). We therefore overrule Mother's fourth issue.

### C. Grounds for termination

Mother's second and third issues argue that the evidence was legally and factually insufficient to support the trial court's findings that termination was warranted under sections 161.001(b)(1)(D) and (E). Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). However, the trial court also terminated Mother's parental rights to L.A. under subsection O, which allows for termination where a parent has failed to comply with a court order establishing the actions necessary for the parent to obtain the return of a child. *Id.* § 161.001(b)(1)(O). Along with a best interest finding, a finding of only one ground alleged under section 161.001(b)(1) is sufficient to support a judgment of termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re K.H.*, No. 02-15-00164-CV, 2015 WL

18

6081791, at *3 (Tex. App.—Fort Worth Oct. 15, 2015, no pet.) (mem. op.); *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). The trial court found termination was in the best interest of the child in this case, and Mother does not challenge the trial court's finding that she failed to comply with the PCSP.

Therefore, we need not address Mother's complaints regarding the challenged grounds for termination. *See A.V.*, 113 S.W.3d at 362. We therefore overrule Mother's second and third issues.

## Conclusion

Having overruled Mother's four issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL: WALKER, MEIER, and SUDDERTH, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 6, 2017