**Affirmed and Opinion Filed October 14, 2022**



In The
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00233-CV**

**IN THE INTEREST OF C.J.P., O.R.P., B.H.P., CHILDREN**

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-19-01286-X**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Reichek, and Goldstein
Opinion by Justice Partida-Kipness

Father and Mother appeal the trial court's decree terminating their parental rights to their children C.J.P., O.R.P., and B.H.P. At the time of termination in 2022, C.J.P. was eleven years old, O.R.P. was six years old, and B.H.P. was four years old. Father challenges the termination on jurisdictional grounds. Mother argues the evidence was legally and factually insufficient to support the trial court's finding that termination was in the children's best interest. We affirm.

## BACKGROUND

On September 3, 2019, and September 4, 2019, the Department of Family and Protective Services (the Department) received two referrals alleging physical abuse of C.J.P. by Father. The second referral was triggered by a suicide outcry made by

C.J.P. at school. The school reported that C.J.P. "talked about going home to choke himself to death" and indicated Father had choked him in the past. The school notified the police department and Mother. A police officer interviewed C.J.P. and Mother at the school. Mother told the officer Father had not choked or hurt the children. She revealed the children may have witnessed Father choking her "a long time ago." She also reported that Father "talks about committing suicide all the time, quite frequently."

On September 6, 2019, Department investigator Anette Ezeomodo interviewed C.J.P. at school. C.J.P. told Ezeomodo that Father choked him until he passed out but could not remember when it happened. C.J.P. reported falling off his scooter the prior evening, and Ezeomodo observed he had a bruise on his left eye and a scar on the back of his right hand. Ezeomodo also interviewed Mother and Father at their residence. During those interviews, Mother again denied that Father ever choked C.J.P. and reported Father "talks about suicide all the time." Father stated he does not abuse C.J.P. and denied being suicidal. Ezeomodo observed O.R.P. and B.H.P in the home but did not interview them due to their young ages. Over the following weeks and months, Department investigators met with Father, Mother, the children, and third parties who knew the family. Father and Mother agreed to cooperate with the Department's services but were unwilling to participate with Family based Safety Services (FBSS). On December 19, 2019, the Department

filed its Petition for Order to Participate in Services. The trial court did not hear or rule on the petition.

On May 4, 2020, the Department received a new open investigation on the case based on concerns of domestic violence in the home. The incident triggering that investigation was an altercation between Mother and Mother's sister, Austina Mock. According to Mock and Father, Mother grabbed Mock by the hair and "ripped out about half of [Mock's] hair" and caused her scalp to bleed. Mother maintains Mock was the aggressor and testified she grabbed Mock's hair "to restrain her from attacking." Mother also testified she did not pull Mock's hair intentionally. Rather, the hair came out when Father tackled Mother into a wall. Police officers arrested Mother at the home. She was charged and received a sentence of nine months deferred adjudication probation, which she completed. The Department took possession of the children following the assault and filed its original petition for protection of the children, for conservatorship, and for termination of parental rights. On May 5, 2020, the trial court signed an ex parte order for emergency care and temporary custody appointing Dallas County Child Protective Services temporary managing conservator of the children. In support of the appointment, the trial court found a continuing danger to the physical health and/or safety of the children if returned to the parents, and determined it was contrary to the children's welfare to remain at home and placement would be in the best interest of the children. The case was set for trial on April 13, 2021 and had a May 10, 2021 dismissal date.

After an unsuccessful mediation, Mother filed a "Joint[1] Motion to Extend Deadline, Motion for Jury Trial Setting and First Motion for Continuance" on April 6, 2021. The basis for the requested extension was that the parties were unable to reach a mediated settlement agreement and the children's counselors believed the parties could benefit from additional family counseling. Father also indicated he would request a jury trial if the parties could not reach a settlement.

The trial court granted the agreed motion by written order on April 7, 2021. The order stated the trial court was granting the motion "for good cause shown," set the case for a jury trial on October 11, 2021, and set a new dismissal date of November 8, 2021. Father filed a motion to extend the dismissal date on September 27, 2021. The trial court granted Father's extension motion and set the new dismissal date for December 1, 2021. Trial commenced November 29, 2021.

The trial court conducted the termination proceeding on six dates between November 29, 2021, and March 1, 2022. The trial court stated its ruling on the record at a March 7, 2022 hearing and signed the decree of termination on March 15, 2022. The trial court terminated Father and Mother's parental rights under sections

---

[1] The motion states it is filed "jointly by and through" the parties' counsel, but is signed only by Mother's counsel. On appeal, Father describes the motion as one "purported to be a joint motion" by the parties. Father did not object to the motion in the trial court. Any objection to the motion on appeal has, therefore, been waived. Further, Mother's counsel certified that the parties conferred on the motion and "agreed upon" the items presented in the motion. No party objected to that certification below. Under this record we construe the "joint motion to extend deadline" as an agreed motion.

161.001(b)(1)(D) and 161.001(b)(1)(E) of the family code. The trial court also found termination was in the best interest of the children. This appeal followed.

**ANALYSIS**

Father and Mother appeal the termination order on different grounds. Father contends the termination order was signed after the mandatory dismissal date and is void. Mother challenges the legal and factual sufficiency of the evidence to support the trial court's best interest findings. We address Father's jurisdictional challenge first because if we conclude the termination order is void, Mother's appeal of the merits of the order will be mooted. *See White v. Smith*, 591 S.W.3d 198, 202–03 (Tex. App.—Tyler 2019, no pet.) ("If a ruling is void, the appellate court lacks jurisdiction to review the ruling's merits."); *Freedom Commc'ns, Inc. v. Coronado*, 372 S.W.3d 621, 623–24 (Tex. 2012) ("[A]ppellate courts do not have jurisdiction to address the merits of appeals from void orders or judgments; rather, they have jurisdiction only to determine that the order or judgment underlying the appeal is void and make appropriate orders based on that determination."); *Custom Corps., Inc. v. Sec. Storage, Inc.*, 207 S.W.3d 835, 837 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (dismissing appeal as moot where related mandamus proceeding had declared judgment upon which appeal was based as void).

## I.     Father's appeal

In one issue, Father contends the March 15, 2022 termination order is void because the trial court signed it after the initial statutorily required dismissal date of

May 10, 2021 had passed. *See* TEX. FAM. CODE § 263.401(a) (providing for automatic dismissal of termination suit if trial has not commenced or an extension has not been granted on the first Monday after the first anniversary of the temporary order appointing the Department temporary managing conservator). More specifically, Father maintains the trial court lost jurisdiction when it extended the dismissal date on April 7, 2021, without making findings that extraordinary circumstances necessitated the children remaining in the temporary managing conservatorship of the Department and such an extension would be in the children's best interest. We review questions of subject matter jurisdiction and statutory interpretation de novo. *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 682 (Tex. 2020); *Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020). "When interpreting statutes, we look to the plain meaning of the enacted text" and enforce it "as written." *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 183 (Tex. 2019). Similarly, we interpret court orders, including the supreme court's emergency orders, "according to the plain meaning of their terms." *Kim v. Ramos*, 632 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2021, no pet.); *Green v. Villas on Town Lake Owners Ass'n, Inc.*, No. 03-20-00375-CV, 2021 WL 4927414, at *9 (Tex. App.—Austin Oct. 22, 2021, pet. denied) (mem. op.). Under this record, we conclude the trial court had jurisdiction over the case when it signed the termination decree.

## A.  Jurisdictional requirements of Tex. Fam. Code § 263.401

In cases where the Department requests termination of parental rights or conservatorship of a child, the family code requires the court to begin trial no later than "the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator." Tex. Fam. Code § 263.401(a). The trial court may extend the deadline once for 180 days upon finding that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b). "If the court retains the suit on the court's docket, the court shall render an order in which the court:

> (1) schedules the new date on which the suit will be automatically dismissed if the trial on the merits has not commenced, which date must be not later than the 180th day after the time described by Subsection (a);
>
> (2) makes further temporary orders for the safety and welfare of the child as necessary to avoid further delay in resolving the suit; and
>
> (3) sets the trial on the merits on a date not later than the date specified under Subdivision (1)."

Tex. Fam. Code § 263.401(b)(1–3). If the trial court grants an extension under subsection (b) but fails to commence the trial on the merits before the new dismissal date, "the court's jurisdiction over the suit is terminated and the suit is automatically dismissed without a court order." *Id.* § 263.401(c); *In re G.X.H.*, 627 S.W.3d 288, 292 (Tex. 2021).

Here, the trial court named the Department temporary managing conservator of the children on May 5, 2020. Thus, the initial dismissal date was Monday, May 10, 2021. *See* TEX. FAM. CODE § 263.401(a) (dismissal date is "the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator."). On April 7, 2021, the trial court granted the parties' "joint" motion to extend the dismissal deadline and ordered a new dismissal date of November 8, 2021. Father maintains the extension was ineffective because the trial court "did not make the required findings" set out in section 263.401(b). According to Father, the trial court lost jurisdiction after May 10, 2021, because it failed to issue specific findings "that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the Department" and "that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." We disagree.

The Texas Supreme Court held in *In re GHX* that such alleged defects are not jurisdictional and must be preserved for appellate review:

> In sum, we conclude that, while a trial court's failure to timely extend the automatic dismissal date before that date passes—through a docket-sheet notation or otherwise—is jurisdictional, ***claimed defects relating to the other requirements of 263.401(b) are not***. Accordingly, with the exception of a trial court's failure to extend the automatic dismissal date before it passes, ***complaints regarding the trial court's compliance with the requirements in subsection (b) must be preserved for appellate review.*** Because the parents failed to preserve them in this case, we hold their complaints regarding the timing and form of the

–8–

> order resetting the trial and dismissal dates are waived. *See* TEX. R. APP.
> P. 33.1.

*In re G.X.H.*, 627 S.W.3d at 301 (emphasis added). This Court and several of our sister courts have applied *In re G.X.H.* to hold that complaints regarding a trial court's failure to comply with the requirements of subsection (b), including a failure to make best interest and extraordinary circumstances findings, must be preserved for appellate review and are, therefore, not jurisdictional. *E.g.*, *In re P.Z.F.*, 651 S.W.3d 147, 153 (Tex. App.—Dallas 2021, pet. denied) (noting *In re G.H.X.* holding that "claimed defects relating to the other requirements of 263.401(b) are not [jurisdictional]" and concluding "Father's other complaints that the trial court failed to make the findings described in subsection (b) were not raised in the trial court and, thus, were not preserved for our review.") (citing *In re G.H.X.*); *M. P. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00163-CV, 2022 WL 4281617, at *5 (Tex. App.—Austin Sept. 16, 2022, no pet. h.) (mem. op.) (applying *In re G.X.H.* and concluding Mother did not preserve jurisdictional argument for review because she did not raise her complaint about the lack of a best interest finding until after the initial dismissal date had passed); *In re P.R.*, No. 10-22-00062-CV, 2022 WL 3655402, at *3 (Tex. App.—Waco Aug. 24, 2022, no pet. h.) (mem. op.) ("any complaint regarding the failure of the trial court to make an express finding of extraordinary circumstances was not preserved for appellate review."); *In re J.F.*, No. 07-22-00058-CV, 2022 WL 3328274, at *3 (Tex. App.—Amarillo Aug. 11, 2022, no pet. h.) (mem. op.) ("While a trial court's failure to timely extend the

automatic dismissal date before that date passes is jurisdictional, claimed defects relating to the other requirements of subsection 263.401(b) are not."); *In re R.J.R.*, No. 04-21-00246-CV, 2021 WL 5813827, at *3 (Tex. App.—San Antonio Dec. 8, 2021, pet. denied) (mem. op.) (appellant's complaint the trial court failed to make the section 263.401(b) findings was not preserved for review because she did not raise the issue in the trial court).

Here, Father's complaint that the trial court failed to issue section 263.401 findings was not preserved for review. Father did not raise this issue when the trial court issued the April 7, 2021 extension order or at any time after the initial dismissal date passed. Indeed, Father continued to participate in the litigation after the first extension order. He moved to take the deposition of C.J.P.'s therapist and to employ a third-party therapist, filed a response to the guardian ad litem's motion to modify the temporary orders, and objected to a visiting judge presiding over hearings. Father even filed a motion to extend the dismissal date on September 27, 2021. The trial court granted Father's extension motion and set the new dismissal date for December 1, 2021. Trial commenced November 29, 2021. Father did not assert objections to the extension order at commencement of trial, during trial, or to the trial court's rendition of judgment. Father also failed to raise deficiencies in the extension order in his post-judgment motion for new trial. Applying *In re G.X.H.* and *In re P.Z.F.*, we conclude Father failed to preserve this issue for review. *In re G.X.H.*, 627 S.W.3d at 301 ("Accordingly, with the exception of a trial court's failure to extend the

automatic dismissal date before it passes, complaints regarding the trial court's compliance with the requirements in subsection (b) must be preserved for appellate review."); *In re P.Z.F.*, 651 S.W.3d at 153; *M. P.*, 2022 WL 4281617, at *5; *In re P.R.*, 2022 WL 3655402, at *3; *In re J.F.*, 2022 WL 3328274, at *3; *In re R.J.R.*, 2021 WL 5813827, at *3. We overrule Father's first issue. TEX. R. APP. P. 33.1.

Father contends the best interest and extraordinary findings are jurisdictional and, thus, not waivable. He relies on this Court's decision in *In re J.S.*, No. 05-21-00898-CV, 2022 WL 620709 (Tex. App.—Dallas Mar. 3, 2022, pet. granted) (mem. op.) to support his argument. In *J.S.*, the initial dismissal date for the termination suit was February 8, 2021. *Id.* at *3. The case was first set for trial on that date, but trial did not commence; instead, the "court conferred off the record with the parties' attorneys and then announced on the record that the parents would receive a jury trial and that the trial would take place on June 14." *Id.* At the Department's request, and without objection from the parents, the court made verbal findings that it was in the child's best interest to extend the case and retain the Department as the child's temporary managing conservator. *Id.* The trial court did not issue a written order setting a new dismissal date until March 30, 2021, nearly six weeks after the initial dismissal date. The March 30 order included findings that " 'extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the Department,'" and continuing the appointment is in the

–11–

child's best interest. *Id.* The court set the new dismissal date for August 7, 2021. *Id.* Trial commenced on June 14, 2021. *Id.*

On appeal, the panel noted the March 30 order was entered too late to extend the jurisdictional period because it came after the initial dismissal date of February 8. *In re J.S.*, 2022 WL 620709 at *3. Thus, the question on appeal was whether the February 8 oral finding on the record satisfied section 263.401(b) and extended the dismissal date. *Id.* The *J.S.* panel concluded the oral finding did not satisfy 263.401(b) because the trial court made only a best interest finding on February 8 and did not mention extraordinary circumstances. *Id.* ("A finding that it is in the child's best interest for the case to be extended and for the Department to remain as temporary managing conservator is not a finding of extraordinary circumstances as required by subsection (b)."). Under that record, the case was automatically dismissed after February 8 and the trial court's judgment was void. *Id.* Father maintains the same logic applies here. We disagree, however, because *In re J.S.* is distinguishable from the case at bar.

For example, the panel in *J.S.* answered a different question than the one presented here. There, the panel concluded that making one of the required findings under section 263.401(a) did not constitute making the other required finding. *In re J.S.*, 2022 WL 620709 at *3. Here, the trial court made both required findings. The trial court explicitly found good cause for the extension in its written order. The finding of "good cause" encompassed a finding of extraordinary circumstances and,

–12–

as such, met the requirements of 263.401(b). *E.g.*, *Foster v. Cunningham*, 825 S.W.2d 806, 808 (Tex. App.—Fort Worth 1992, writ denied) ("good cause exception is necessarily a narrow one requiring a showing of extraordinary circumstances."); *see also In re G.A.*, No. 01-11-00565-CV, 2012 WL 1068630, at *7 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, pet. denied) (mem. op.) ("a finding of extraordinary circumstances under section 263.401(b) satisfies the "good cause" requirement of Rule 18a."). As for a best interest finding, the parties agreed in the joint motion for extension that it was in the best interests of the children to extend the dismissal date and the Department's role of temporary managing conservator. As such, by granting the joint extension motion, the trial court necessarily made a best interest finding. *See, e.g.*, *In re Weekley Homes, L.P.*, 295 S.W.3d 309, 316 (Tex. 2009) (concluding trial court's decision to order forensic examination implied a finding that evidence was not reasonably available and required extraordinary steps for retrieval and production);*see also In re Lynd Co.*, 195 S.W.3d 682, 686 (Tex. 2006) (absent a trial court's express finding that a party received late notice of the judgment, a finding should be implied by the court's granting of a motion for new trial). *see also In re F.S.*, No. 09-22-00114-CV, 2022 WL 4371008, at *8 (Tex. App.—Beaumont Sept. 22, 2022, no pet. h.) (mem. op.) ("since the parties did not ask the trial court for written findings, the findings may be implied if the record before the appellate court supports the ruling the trial court made."). Unlike *In re J.S.*, the trial court made both subsection (b) findings here. Further, the extension

order was signed, and those findings made before the initial dismissal date passed. In *J.S.*, in contrast, the extension order was not signed until after the dismissal deadline had already passed. *Id.* Moreover, the panel in *J.S.* was not presented with the question of appellate preservation. We conclude *J.S.* is inapplicable to our analysis here.

We instead find this case analogous to *In re G.X.H.* and *In re P.Z.F.* In those cases, as here, the extension order (or its equivalent) was signed or made before the initial dismissal date, and both the Texas Supreme Court and this Court concluded the issuance of extraordinary circumstances and best interest findings were not jurisdictional.[2] Applying those holdings here, we conclude the Department's suit was not automatically dismissed on May 10, 2021, because the trial court extended the automatic dismissal date by written order on April 7, 2021, and retained jurisdiction over the case. Accordingly, even assuming Father preserved his complaint about the form of the order for our review, we overrule Father's sole issue.

---

[2] To the extent *In re J.S.* can be construed as conflicting with *In re P.Z.F.* regarding preservation of error or the non-jurisdictional nature of the best interest and extraordinary circumstances findings required by the statute, we are bound by stare decisis to follow *In re P.Z.F.*, the earlier case. *Mitschke v. Borromeo*, 645 S.W.3d 251, 256–58 (Tex. 2022) ("If one appellate panel decides a case, and another panel of the same court differently resolves a materially indistinguishable question in contravention of a holding in the prior decision, the second panel has violated the foundational rule of stare decisis." Under those circumstances, a third panel is "objectively bound to follow the earliest non-superseded line of cases . . . ."). Further, the Texas Supreme Court denied the petition filed in *In re P.Z.F.*, but granted the petition for review on rehearing in *In re J.S.* The Texas Supreme Court will hear argument in *In re J.S.* in January 2023. The granting of the petition signals that at least four justices are convinced the court of appeals erred in its judgment. *Texas Rules of Form: The Greenbook* Appendix D (Texas Law Review Ass'n ed., 14th ed. 2018).

## B.     Jurisdiction after first extension

Father's appeal is limited to his argument that the April 7, 2021 order did not extend the trial court's jurisdiction, However, on October 6, 2021, the trial court extended the dismissal date a second time. Section 263.401 only empowered the trial to extend the automatic dismissal date for 180 days. TEX. FAM. CODE § 263.401(c). Because the trial court extended the dismissal date a second time, we must determine whether the trial court retained jurisdiction over this matter between November 8, 2021, the first extended dismissal date, and November 29, 2021, the date trial began. *See Nalle v. City of Austin*, 85 Tex. 520, 550, 22 S.W. 960, 961 (1893) ("Every court must, in the first instance, determine its own jurisdiction"); *see also Ex Parte Monroe*, No. 07-14-00429-CV, 2015 WL 690826, at *1 (Tex. App.—Amarillo Feb. 18, 2015, no pet.) ("A court of appeals is required to determine its own jurisdiction in each case.") (citing *Ex parte Lewis*, 663 S.W.2d 153, 154 (Tex. App.–Amarillo 1983, orig. proceeding)).

On September 27, 2021, Father filed a motion to extend the dismissal date Father requested the extension to provide his expert witness additional time and opportunity to evaluate the notes of the children's therapists, interview Father, observe a visit between Father and children, and formulate an opinion concerning conservatorship of the children. Father cited "the current COVID Order" as authority to extend the dismissal date and continue the trial setting. The trial court granted

–15–

Father's motion by written order on October 6, 2021, and set the new dismissal date for December 1, 2021. Trial commenced November 29, 2021.

When Father filed the extension motion on September 27, 2021, the trial court had already granted the sole 180-day extension allowed by statute on April 7, 2021. However, the supreme court has issued a series of emergency orders in response to the COVID-19 pandemic that "permit[ ] trial courts to suspend the deadlines and procedures in Section 263.401." *C.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00587-CV, 2022 WL 1121428, at *2 (Tex. App.—Austin Apr. 15, 2022, no pet.) (mem. op.); *E. N. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-21-00014-CV, 2021 WL 2460625, at *5 (Tex. App.—Austin June 17, 2021, no pet.) (mem. op.) (stating emergency orders "would theoretically have allowed the district court to extend the case indefinitely by granting an extension under each successive order."). Two of those orders were in effect when the second extension was sought and granted here. The Fortieth Emergency Order was in effect when Father filed his extension motion, and the Forty-Third Emergency Order was in effect when the trial court issued its second extension order on October 6, 2021. *Fortieth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 911 (Tex. 2021) (effective August 1, 2021); *Forty-Third Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 929 (Tex. 2021) (effective October 1, 2021). The Forty-Third Emergency Order provides that in any proceeding under Subtitle E, Title

5 of the family code, "the dismissal date may be extended, without a participant's consent, as follows:

> a. for any such proceeding that, on May 26, 2021, had a dismissal date that was previously modified under a prior Emergency Order Regarding the COVID-19 State of Disaster, the court may extend the dismissal date for a stated period ending no later than December 1, 2021;

> b. for any such proceeding that, on May 26, 2021, had been previously retained on the court's docket pursuant only to Section 263.401(b) or (b-1), the court may extend the dismissal date for a stated period ending no later than February 1, 2022;

> c. for any such proceeding that, on May 26, 2021, had not been previously retained on the court's docket pursuant to Section 263.401(b) or (b-1), the court may extend the initial dismissal date as calculated under Section 263.401(a) for a stated period ending no later than April 1, 2022; or

> d. for any such proceeding that is filed on or after May 26, 2021, the court may extend the initial dismissal date as calculated under Section 263.401(a) only as provided by Section 263.401(b) or (b-1).

*Forty-Third Emergency Order*, 629 S.W.3d at 930; s*ee also Fortieth Emergency Order*, 629 S.W.3d at 912 (same dates as found in paragraph 5 of Forty-Third Emergency Order). Paragraph 5.b of the Forty-Third Emergency Order applied to the underlying proceeding because the trial court's first extension order was signed April 7, 2021. Accordingly, on May 26, 2021, the underlying proceeding "had been previously retained on the court's docket pursuant only to Section 263.401(b) or (b-1)." *Forty-Third Emergency Order*, 629 S.W.3d at 930. The Forty-Third Emergency Order, therefore, permitted the trial court to extend the dismissal date a second time "for a stated period ending no later than February 1, 2022." *Id.*; *E.g.*, *C.C.*, 2022 WL

1121428, at *4 (concluding trial court retained jurisdiction over the case at the time of trial where three extensions of dismissal date were permitted by Covid emergency orders in effect at the time of each extension).

### C. Conclusion

We conclude the trial court's extension of the court's jurisdiction pursuant to Section 263.401(b) was made timely for the trial court to extend its jurisdiction over the proceedings, and any complaint regarding the failure of the trial court to make an express finding of extraordinary circumstances was not preserved for appellate review. We overrule Father's sole appellate issue.

## II. Mother's Appeal

In a single issue, Mother contends the evidence was legally and factually insufficient to support the trial court's determination that terminating her parental rights was in the best interests of the children.

### A. Standard of Review

Because the fundamental liberty interest of a parent in the care, custody, and control of her child is one of constitutional dimensions, involuntary parental termination must be strictly scrutinized. *In re C.V.L.*, 591 S.W.3d 734, 748 (Tex. App.—Dallas 2019, pet. denied) (first citing *Troxel v. Granville*, 530 U.S. 57, 65–66, (2000); *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014); and then citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). In parental termination cases, due process requires the petitioner to justify termination by clear and convincing evidence. Tᴇx.

–18–

FAM. CODE § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). "Clear and convincing evidence" is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) (quoting TEX. FAM. CODE § 101.007); *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied). "As a matter of logic, a finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). Under both legal and factual sufficiency standards, we (i) consider all the evidence, (ii) defer to the factfinder's credibility determinations, and (iii) determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re C.V.L.*, 591 S.W.3d at 748 (first citing *In re N.T.*, 474 S.W.3d at 475; and then citing *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002)). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d at 630–31.

In conducting a legal-sufficiency review of an order terminating parental rights, the reviewing court cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *In re C.V.L.*, 591 S.W.3d at 748–49. We "consider all the evidence, not just that which favors the verdict," and we assume the fact-finder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so. *In re N.T.*, 474 S.W.3d at 475. We disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a termination finding, an appellate court asks whether, in light of the entire record, the evidence is such that a fact-finder could reasonably form a firm conviction about the truth of the State's allegations against the parent. *In re N.T.*, 474 S.W.3d at 475; *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.—Dallas 2014, no pet.). The appellate court must also consider whether the disputed evidence is such that a reasonable fact-finder could not have reconciled the disputed evidence in favor of its finding. *In re N.T.*, 474 S.W.3d at 475. If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *In re C.V.L.*, 591 S.W.3d at 749. "And in making this determination, the reviewing court must undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.' " *In re A.B.*, 437 S.W.3d at 503 (quoting *In re C.H.*, 89 S.W.3d at 26).

–20–

## B. Best interest of the children

A judicial determination of the "best interest" of a child "is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm." *In re M.J.P.*, No. 05-16-01293-CV, 2017 WL 655955, at *6 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.). Rather, "best interest" is "a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *Id.* (quoting *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (orig. proceeding)); *see also In re C.R.*, 263 S.W.3d 368, 375 (Tex. App.—Dallas 2008, no pet.) ("[P]arental rights may not be terminated merely because a child might be better off living elsewhere.").

The supreme court has identified nine factors that may assist our review of a best-interest finding:

> (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the person seeking custody; (5) the programs available to assist the person seeking custody in promoting the best interest of the child; (6) plans for the child by the person seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).[3] The *Holley* factors focus on the best interest of the child, not the best interest of the parent, and are not

---

[3] Section 263.307(b) lists several best-interest factors the trial court and the Department can consider in determining whether a child's parents are willing and able to provide the child with a safe environment.

exhaustive. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ); *In re C.H.*, 89 S.W.3d at 27.

A best interest finding need not be supported by evidence of every *Holley* factor, particularly if there is undisputed evidence that the parental relationship endangered the child's safety. *See In re C.H.*, 89 S.W.3d at 27. Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *D.M. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-17-00137-CV, 2017 WL 2628949, at *4 (Tex. App.—Austin June 13, 2017, no pet.) (mem. op.). On the other hand, the presence of scant evidence relevant to each factor will generally not support such a finding. *In re C.H.*, 89 S.W.3d at 27. Although courts may consider any other factor relevant to the child's best interest, there is "[a] strong presumption ... that a child's best interests are served by preserving the parent-child relationship, where possible." *In re D.D.M.*, 2019 WL 2939259, at *5 (quoting *Burns v. Burns*, 434 S.W.3d 223, 230 (Tex. App.—Houston [1st Dist.] 2014, no pet.)); *In re R.R.*, 209 S.W.3d at 116 ("there is a strong presumption that the best interest of a child is served by keeping the child with a parent"). However, although there is a strong presumption that maintaining the parent–child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment is in the

---

TEX. FAM. CODE § 263.307(b). Mother does not cite this provision or discuss these other factors in her brief. We, therefore, analyze only the *Holley* factors here.

child's best interest. TEX. FAM. CODE §§ 153.131(b); 263.307(a); *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

## C. Application of Law to Facts

Mother contends the evidence is legally and factually insufficient to support the trial court's best interest finding. Mother does not specifically cite any *Holley* factor in her brief. Her arguments and the evidence she cites in support, however, implicate factors two, four, five, six, and seven. She also argues generally that no reasonable trier of fact could form a firm belief or conviction that termination of her parental rights is in the best interest of the children, even considering all the evidence in light most favorable to the Department. Because our analysis of the entire record is guided by the *Holley* factors, we will apply each factor to the evidence here.

### 1. The desires of the child

The first *Holley* factor, the child's desires, is generally considered neutral where, as here, the children did not testify due to their young ages. *See In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("The young age of the child render[s] consideration of the child's desires neutral."). None of the children testified here, and there is no evidence of their desires. We, therefore, view this *Holley* factor neutrally. *See In re G.A.L.*, No. 05-19-00844-CV, 2020 WL 582282, at *9 (Tex. App.—Dallas Feb. 6, 2020, no pet.) (mem. op.). However, the children's second foster mother, K.M., testified that B.H.P. did not enjoy in-person visits with either parent and would beg K.M. not to take her to the visit. According

to K.M., before a parental visit B.H.P. would scream "please don't take me, please keep me safe, I don't want to go." This evidence shows a desire of B.H.P. to avoid contact with Mother and Father. As to B.H.P., we view this factor slightly in favor of termination. *See In re A.O.*, No. 05-21-00789-CV, 2022 WL 620631, at *9 (Tex. App.—Dallas Mar. 3, 2022, no pet.) (mem. op.) (if there is no direct evidence of a child's desires, a factfinder may infer the child's desires from the other evidence admitted at trial).

### 2.     The emotional and physical needs of the children now and in the future

The second *Holley* factor addresses the current and future emotional and physical needs of the children. Evidence of this factor generally demonstrates what the child's emotional and physical needs are, specifically any special needs, and whether the parent seeking custody was willing and able to meet those needs. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012). Here, the evidence established the children suffered severe emotional trauma and physical abuse by their parents that continued to have adverse effects on their mental health and would require the children to continue therapy in the future.

C.J.P.'s outcries included allegations Father choked him until he passed out and punished him by forcing C.J.P. to run laps at the school track and perform excessive exercises. At the time of trial, C.J.P. was in a residential treatment center receiving intensive therapy and a specialized level of care. This was due to C.J.P.'s violent outbursts and incidents where he acted out sexually. For example, in the first

foster home placement, the family reported C.J.P. was "performing oral sex on a foster sibling" so he was removed from that home. He was then placed in a residential treatment center. Conservatorship Caseworker Travis Gump testified that C.J.P. "has a fairly high level of need" because he is in a residential treatment center receiving intensive therapy. C.J.P. has anger issues, violent acting out, and sexual acting out. He also acts out violently against staff members at the treatment center. At the time of trial, C.J.P. was making some progress in treatment, but would need to continue in residential treatment for the foreseeable future. The girls, O.R.P. and B.H.P., were also experiencing behavioral and emotional issues while in foster care and were undergoing therapy and counseling. Both girls made outcries of sexual abuse by Father and Mother. The evidence also shows B.H.P. has hydrocephalus.

Mother insists she has "the ability to house and educate" the children. Other than being willing to continue the children's therapy, however, Mother does not explain how and why she is in a position financially and emotionally to meet the emotional and physical needs of the children. Under a legal-sufficiency review, we must presume the trial court disbelieved Mother' s testimony that she could meet her children's emotional and physical needs. *See In re A.S.*, 261 S.W.3d at 87. Accordingly, under a legal-sufficiency review, this factor weighs in favor of termination.

Under a factual-sufficiency review, we must consider all of the evidence. *In re N.T.*, 474 S.W.3d at 475. Mother insists she has the means and willingness to meet

the children's physical needs because she has a job making $800 a month and an apartment set up with space for all of the children, furniture, food, and clothing. Mother also plans to put the children in school and get them the therapy they need. Mother's best friend, Michelle McAtee, told the trial court she believes Mother's apartment and income are sufficient for the three children to live with Mother. There is no evidence, however, of how Mother planned to meet C.J.P.'s high level of needs during and after his discharge from residential treatment. Similarly, the evidence shows B.H.P. has hydrocephalus. The record is silent as to what special needs she has because of that medical condition. Prior to removal, Kristy Breukelman, a Family Based Safety Services (FBSS) caseworker assigned to this case observed the home was consistently "cluttered and dirty" and "smelled like urine," and the children appeared dirty. The record does not show whether Mother had corrected those issues before trial.

As to the children's emotional needs, the record shows Mother failed in the past to meet those needs. Mother expressed disbelief that C.J.P. was suicidal during the investigation and at trial and dismissed O.R.P.'s outcries as fabrications made by a child seeking attention. Caseworker Breukelman concluded Mother did not believe C.J.P. was suicidal and observed Mother did not appear to be protective of C.J.P. and did not believe the concerns about him. Mother was not receptive to receiving services for herself or the children and did not cooperate with FBSS until order by the court to cooperate. She did not think services were necessary because they had

–26–

contact with CPS in the past and had completed counseling services then. The trial court could reasonably conclude from Mother's own testimony that she does not believe the children were suffering emotional trauma requiring continued therapy.

Caseworker Gump testified Mother failed to protect the children from sexual and physical abuse "because she took no action to stop it or prevent it from occurring again." CASA Caseworker Larry Dolan agreed with Gump's assessment. According to Dolan, Mother admitted to him that domestic violence occurred in the home and she failed to protect the children from it. Mother also admitted she did not protect C.J.P. or intervene when Father picked C.J.P. up by the throat and choked him. The record also shows Mother did not timely report an incident in which she witnessed O.R.P. touching Father's penis. The judge could infer from Mother's past conduct endangering the children's welfare that similar conduct would recur if the children were returned to her care. *In re D.W.*, 445 S.W.3d 913, 928 (Tex. App.—Dallas 2014, pet. denied) (first citing *In re J.D.B.*, 435 S.W.3d at 467–68; and then citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g)). Considering the entire record, we conclude the second *Holley* factor supports termination here and is supported by factually sufficient evidence.

### 3. The emotional and physical danger to the children now and in the future

The third *Holley* factor addresses the emotional and physical danger of the child now and in the future. Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco

2012, pet. denied). We conclude evidence of Mother's neglect, physical abuse, and failure to intervene to stop Father's abuse of the children supports the trial court's best interest finding. *See, e.g., id.*, 385 S.W.3d at 82–83 (evidence of mother's history of neglecting and endangering children by exposing them to domestic violence supported trial court's finding that termination was in children's best interest).

The record shows Mother had three children from a previous relationship who were subject to Department referrals and ultimately removed from Mother's custody. The oldest child in that group, O.C., came to the Department's attention in 2008 when O.C.'s father was accused of sexually abusing her. O.C.'s father confessed to the sexual abuse, was indicted, and his parental rights were terminated. Mother's reaction to the sexual abuse allegations, even in the face of the father's confession, was disbelief. Mother maintained her parental rights to O.C. but did not keep custody of her. The parents caring for O.C. became her possessory managing conservators. In 2009, another child in that family group, Z.C., received head injuries including subdural hematomas. It was alleged Mother and her boyfriend, Marcello Romero, caused the injuries. Z.C. was removed and placed with the family caring for O.C. Mother had a third child, N.R., with Romero. N.R. was removed and placed in foster care shortly after he was born. In June 2009, N.R. was given back to Mother on a monitored return. She was living with Father at that time. On August 25, 2009,

there was a domestic violence incident between Mother and Father. N.R. was removed and eventually placed with O.C. and Z.C.

Caseworker Gump testified he sees "a pattern of behavior" by Mother that began with the first family group (O.C., Z.C., and N.R.) and continued with C.J.P., O.R.P., and B.H.P. This pattern included domestic violence in the home, sexual abuse of a child, and Mother's refusal to accept the sexual abuse occurred. According to Gump, he "saw a significant parallel between the first sibling group and the second" concerning the impact of Mother completing services. Specifically, Gump noted that Mother "completed services in the first case designed to address the risk factors in the family" but was still involved in domestic violence with the Father and her sister, Austina Mock, in this case. Gump explained that despite receiving services in both cases, he saw Mother engage in the same or similar behaviors following those services. Indeed, the current case arose when C.J.P. told a teacher he wanted to choke himself until he died. Although C.J.P. was in a residential treatment facility at the time of the final hearing, Mother was still not convinced C.J.P. was serious about those statements. Mother expressed the same disbelief during the investigation underlying this case.

Domestic violence is a continuing theme in Mother's life. In April 2020, Caseworker Breukelman visited the home following an instance of domestic violence between Mother and Father. The altercation occurred when Mother thought Father was having sex with Mock. Mother became upset, got into a physical

altercation with Father, and "tried to rip his penis off." Then, on May 4, 2020, Mother assaulted Mock in the home. That altercation resulted in Mother's arrest, charge, and conviction for assault causing bodily injury. The record also shows Father was charged with aggravated assault against Mother before the children were born and felony assault against Mother after C.J.P. and O.R.P. were born.

The record also includes allegations of sexual abuse of the children, and Mother's failure to stop the abuse. Rona Amora is a licensed professional counselor who was treating O.R.P. and N.H.P. at the time of trial. O.R.P. told Amora and the girls' second foster mother, K.M., that Mother and Father allowed her to watch them have sex. When K.M. asked O.R.P. "did you sneak to watch it," O.R.P. responded "no, I had permission." O.R.P. was five years old when she reported this. K.M. told the court about an incident in April 2021 when O.R.P. saw a couple on TV and said they "were about to have sex." O.R.P. then explained "in great detail sexual acts" and the descriptions were "very graphic and very, very detailed." According to K.M., O.R.P. accurately described what happens during sexual intercourse, including that a male penis begins "growing in size" and then moves in an out of the woman's vagina before withdrawing and ejaculating. K.M. concluded O.R.P. gained that knowledge from watching Mother and Father have sex. Based on O.R.P.'s statements, K.M. believes Mother was present and participating in the sexual act and did not stop the children from watching.

O.R.P. also told K.M. and Amora that Mother regularly allowed teenage boys to come to the house and engage in oral sex on O.R.P. Amora testified that O.R.P. reported the teenage boys came to the house and Mother allowed the boys to take off O.R.P.'s clothes and touch her inappropriately. O.R.P. told Amora that her mother "let them do it" and "didn't care."

Amora described Mother and Father as "sexual abusers." She testified that both girls reported that Father and Mother were the people having sex in front of them and allowing them to watch. Amora concluded Mother sexually abused the children by giving the children permission to watch her and Father have sex and by allowing teenage boys to inappropriately touch and sexually abuse O.R.P.

Amora further explained she concluded Mother was a sexual abuser who abused the girls because the girls identified both Mother and Father as their abusers. Amora believed O.R.P.'s outcry in part because O.R.P. had "language and knowledge about sexual relations that children her age shouldn't have." Further, O.R.P. and B.H.P. engaged in sexual behaviors after removal inappropriate for their ages.

Mother denied O.R.P.'s allegations regarding the teenage boys and allowing the children to watch her have sex with Father. However, Mother admitted she witnessed but did not report an incident in which she saw O.R.P. holding Father's penis. Gump testified Mother told him that she had walked into the kitchen of her apartment and saw O.R.P. standing in the kitchen with Father's penis in her hand in

–31–

2018 or 2019. At trial, Mother described the incident differently. She testified she walked into the bedroom and saw Father and O.R.P. on the bed, and O.R.P. was "playing with his genitals." Mother presented conflicting testimony concerning whether she reported the incident. She admitted, however, that she did not report the incident before the children were removed in 2020.

In relation to the case with the first family group, the Department concluded any child in Mother's care "would be in grave danger." Caseworker Gump agrees with that assessment and believes that is still the case now. He further explained the Department's concerns about the children's safety stem from Mother's engagement in this same behavior before. Mother completed services "designed to address this behavior" but those services "didn't have any affect." Gump, Amora, and the Guardian Ad Litem believe termination is in the children's best interest.

The trial court could have reasonably concluded that considering Mother's past relationships, her demonstrated inability to protect her children from the emotional and physical dangers of domestic violence and sexual activity in the home, and her minimization of her children's allegations, the children had and would continue to be subject to emotional and physical danger. We conclude the evidence is legally and factually sufficient to support a finding that the third *Holley* factor favors termination.

**4.      The parental abilities of the person seeking custody**

In reviewing the parental abilities of a parent, a factfinder can consider the parent's past neglect or past inability to meet the physical and emotional needs of their children. *I.D.G.*, 579 S.W.3d at 854. A factfinder "may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future." *J.D.*, 436 S.W.3d at 118. "Evidence of a recent improvement does not absolve a parent of a history of irresponsible choices." *In re A.M.*, 385 S.W.3d at 83. Mother maintains she has "exhibited the proper parenting skills that would serve the children's best interests" and believes "she is ready to properly take care of her children" because she has completed and learned from the services provided by the Department. The Department, in contrast, argues Mother's inability to provide for the physical and emotional needs of the children now and in the future "calls into question" Mother's parental abilities. We agree with the Department.

As discussed in detail above, the record shows Mother's inability to meet the children's physical and emotional needs. The evidence also shows Mother's inability to protect the children from abuse. We conclude the evidence is legally and factually sufficient to support a finding that this factor weighs in favor of termination.

**5.      The programs available to assist the person seeking custody in promoting the best interest of the child**

Mother testified she completed her court-ordered services and sought other therapies and classes so she could address any possible issues going forward. This

included attending parenting classes at the Genesis Program, which is geared to helping parents navigate parenting with children who have been traumatized. Mother, however, refused to participate in services until ordered by the trial court to do so. Further, Caseworker Gump and the Department have concerns that completing services are not a marker of success for Mother because she completed services in the past and then reverted to old behaviors. Those behaviors included ongoing domestic violence in Mother's relationships and her disbelief of her children's outcries. Under these circumstances, we conclude the availability of services does not favor reunification here.

**6. Plans for the child by the person seeking custody**

**7. The stability of the home or proposed placement**

We consider the sixth *Holley* factor, the plans for the children, and seventh *Holley* factor, the stability of the home or proposed placement, together. The factfinder may compare the parent's and the Department's plans for the child and consider "whether the plans and expectations of each party are realistic or weak and ill-defined." *J.D.*, 436 S.W.3d at 119-20. A parent's failure to show that he or she is stable enough to parent children for any prolonged period entitles the factfinder "to determine that this pattern would likely continue, and that permanency could only be achieved through termination and adoption." *In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.). A factfinder may also consider the consequences of its failure to

terminate parental rights and that the best interest of the children may be served by termination so that adoption may occur rather than the temporary foster-care arrangement that would result if termination did not occur. *In re B.H.R.*, 535 S.W.3d 114, 124 (Tex. App.—Texarkana 2017, no pet.).

Mother told the trial court she has a plan for the children that includes taking them to school, providing them food, shelter, and clothing, and getting the children any therapy they may need. At the time of termination, Mother was employed cleaning houses and providing meals for her friends and earned approximately $800.00 per month. She also had an apartment set up for her and the children. The Department's permanency plan is termination of the parental rights and adoption of the children. Gump, Amora, and the Guardian Ad Litem agreed the Department's plan for termination and adoption was in the children's best interests. We agree.

There was legally and factually sufficient evidence for the trial court to determine that the Department's plan to keep O.R.P. and C.H.P. in the care of their current foster parents for adoption would provide them with a permanent stable home they would not find with Mother. *See, e.g.*, *J.F.-G.*, 612 S.W.3d at 389. "[P]ermanence is of paramount importance in considering a child's present and future needs." *Dupree v. Texas Dept. of Protective and Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no pet.). The Department's plan provides permanence to these children. O.R.P. and B.H.P. have been in the care of their current foster parents since August 2021. Those parents want to adopt the girls and

"are open to adopting" C.J.P. if the behaviors he is being treated for can be brought under control. We conclude that the evidence was legally and factually sufficient for the trial court to form a firm conviction or belief that the Department's permanency plan was in the children's best interest. *See In re A.O.*, 2022 WL 620631, at \*11; *see also In re D.V.*, 480 S.W.3d 591, 603 (Tex. App.—El Paso 2015, no pet.).

### 8. The acts or omissions of the parent that may indicate the parent-child relationship is not a proper one

### 9. Any excuse for the acts or omissions of the parent

Finally, we consider the eighth and ninth *Holley* factors together. These factors consider acts or omissions of the parent that indicate the parent-child relationship is improper, as well as any excuses for the behavior. Mother and Father admitted they were in a physically abusive relationship before and after the children's removal. The evidence also showed Mother sexually abused the children and failed to intervene when Father physically and sexually abused the children. Mother's own testimony indicated a refusal to believe C.J.P. was suicidal. She also accused O.R.P. of making up her allegations of sexual abuse. Mother also blamed Father and Mock for causing the altercation that precipitated the children's removal even though Mother was the only person arrested and charged.

Given the extent of Mother's acts or omissions and her failure to recognize her conduct was detrimental to the children, we conclude these two factors weigh in favor of termination of parental rights. *See In re D.W.*, 445 S.W.3d 913, 932 (Tex. App.—Dallas 2014, pet. denied); *see also In re V.V.*, 349 S.W.3d 548, 556 (Tex.

–36–

App.—Houston [1st Dist.] 2010, pet. denied) ("Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction."); *In re A.M.*, 385 S.W.3d 74, 82–83 (Tex. App.—Waco 2012, pet. denied) (evidence of mother's history of neglecting and endangering children by exposing them to domestic violence supports finding termination was in each child's best interest).

### D. Summary of factors and conclusion

Based on the record evidence, when viewed in the light most favorable to the ruling and as a whole, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of Mother's parental rights is in the children's best interest and therefore hold the evidence is both legally and factually sufficient to support the trial court's best interest findings as to both parents under section 161.001(b)(2). We overrule Mother's sole appellate issue.

### CONCLUSION

The trial court retained jurisdiction over the case and parties when it rendered the termination order therefore the order is not void. Further, we conclude the evidence supports the trial court's determination that termination of Mother's parental rights is in the children's best interest.

Accordingly, we overrule Father and Mother's appellate issues and affirm the trial court's termination of Father and Mother's parental rights to C.J.P., O.R.P., and B.H.P.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

220233F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF C.J.P.,
O.R.P., B.H.P., CHILDREN,

No. 05-22-00233-CV       V.

On Appeal from the 305th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. JC-19-01286-
X.
Opinion delivered by Justice Partida-
Kipness. Justices Reichek and
Goldstein participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee recover its costs of this appeal from appellants jointly and severally.

Judgment entered this 14th day of October 2022.